# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,     )
                                )
          Plaintiff,        )
                                )
v.                               ) Case No. 7-CR-122-GKF
                                )
RICHARD DALE MONTGOMERY,    )
                                )
          Defendant.       )

## OPINION AND ORDER

Before the court is the Motion to Vacate, Set Aside, or Correct Sentence [Dkt. #70] filed by defendant Richard Dale Montgomery's ("Montgomery"). The United States objected to motion.

On September 20, 2007, at the conclusion of a four-day jury trial, Montgomery was convicted of coercion and enticement of a minor in violation of 18 U.S.C. § 2422(b). [Dkt. #58]. On December 11, 2007, the court sentenced him to 120 months imprisonment followed by seven years of supervised release. [Dkt. #64]. Montgomery did not appeal the conviction or the sentence.

Montgomery, acting pro se, filed his 28 U.S.C. § 2255 motion on November 20, 2008. [Dkt. #70]. On April 12, 2010, the court granted defendant's motion for an evidentiary hearing on his claim that his counsel provided ineffective assistance by failing to obtain and present evidence during trial, failing to call certain witnesses at sentencing and failing to file an appeal. [Dkt. #94 at 19]. Defendant's § 2255 motion was denied on all other grounds. [*Id.*]. The court appointed the Federal Public Defender's Office to represent defendant in this matter. [*Id.*]. The

§ 2255 motion was referred to United States Magistrate Judge T. Lane Wilson for evidentiary hearing.

On May 5 and 23, 2011, Magistrate Judge Wilson conducted an evidentiary hearing [Dkt. ##124, 127].   On September 6, 2011, the Magistrate Judge filed his Report and Recommendation, in which he recommended defendant's § 2255 motion be denied.  [Dkt. #138].

Defendant filed an Objection to Report and Recommendation of United States Magistrate Judge, asserting all three bases for his claim for ineffective assistance of counsel merited granting his motion.  [Dkt. #140]

Pursuant to 28 U.S.C. § 636(b)(1), the court must make a de novo determination of those portions of the report and recommendation to which objection is made.

## I. Standard of Review of Ineffective Assistance of Counsel Claims

To prevail on an ineffective-assistance claim under *Strickland v. Washington*, 466 U.S. 668 (1984) Montgomery must establish two elements:  "First, he must show that [his] counsel 'committed serious errors in light of prevailing professional norms such that his legal representation fell below an objective standard of reasonableness.'"  *Wackerly v. Workman,* 580 F.3d 1171, 1176 (10th Cir. 2009) (quoting *Castro v. Ward,* 138 F.3d 810, 829 (10th Cir. 1998)) (internal quotation marks and accompanying citation omitted).  "Second, [he] must show that this deficient performance mattered—namely, that there is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.,* (quoting *Strickland,* 466 U.S. at 688).

Judicial scrutiny of counsel's performance must be highly deferential. *Strickland,* 466 U.S. at 689.  In addressing an ineffectiveness claim, a court "must judge the reasonableness of counsel's challenged conduct," and determine whether, in light of all the circumstances, the acts

and omissions identified by the defendant were "outside the wide range of professionally competent assistance." *Id.* at 690. In so doing, the court "should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable judgment." *Id.*

## II. Alleged Instances of Ineffective Assistance of Counsel

Montgomery asserts trial counsel was ineffective in the following respects:

(1) Ward failed to obtain the hard drive from Montgomery's computer and/or to request a continuance of trial in order to obtain the hard drive;

(2) Ward failed to comply with Montgomery's request to call four character witnesses at the sentencing hearing as mitigating evidence; and

(3) Ward failed to comply with Montgomery's request to file a direct appeal from his conviction and sentence.

## III. Failure to Obtain Hard Drive

Montgomery contends Ward rendered ineffective assistance because he failed to obtain the hard drive to Montgomery's computer before trial and failed to move for a continuance of trial so that he could an independent forensic analysis of the hard drive performed. He alleged that the computer hard drive would have shown the government (1) failed to produce 30 to 50 days of "chats" between defendant and a government agent posing as a 13-year-old girl; (2) failed to obtain a complete copy of exchange chats; (3) solicited him to send photographs of himself; (4) depicted chats out of chronological sequence; (5) initiated all chats except three; and (6) urged him to stop pretending and meet in person. [Tr. Vol. II at 6, 20-21, 27, 29-32, 43, 45, 52]. This evidence, Montgomery argues, was exculpatory in nature and would have bolstered his entrapment defense.

## A. Evidence Presented

### 1. Ian Buchanan

Detective Ian Buchanan of the Broken Arrow Police Department testified he initiated an online investigation on January 23, 2007, as part of his assignment to the FBI's Innocent Images Task Force. [Dkt. #131, Tr. Vol. II at 54-55]. He posed as a minor child, "fastpitchdebbie 13" and entered an online chat room. [*Id.*]. He testified Montgomery initiated contact with him by sending a message asking "ASL," which Buchanan understood to mean "Age, Sex, Location." [*Id.* at 55-56]. Buchanan "gave him the age of 13, sex female and location Tulsa." [*Id.* at 56]. Buchanan testified the original conversation was not captured because it occurred in a chatroom where multiple conversations were going on at once and the FBI had no mechanism to capture all of the chat as it was occurring. [*Id.* at 56-57]. Buchanan did not believe the chat would be logged on Montgomery's hard drive either. [*Id.* at 57]. He testified Montgomery invited fastpitchdebbie 13 to be his friend, and then sent a friend request, which Buchanan accepted. [*Id.* at 57-58]. Further, he testified he never sends a friend request in the chat room at the beginning of an investigation, but rather would "sit quiet and wait for someone to approach" him and ask him questions, due to concerns about entrapment. [*Id.* at 58]. Although the initial chat on January 23, 2007, was not captured, Buchanan prepared a report on August 1, 2007, memorializing the encounter. [*Id.* at 58-59, 84].

Buchanan testified that after the initial contact, he and Montgomery had additional chats, many of which Buchanan initiated. [*Id.* at 59-60]. Buchanan confirmed that he testified to this at trial. [*Id.* at 60]. All of the conversations between fastpitchdebbie13 and Montgomery were automatically logged by the archive feature of Yahoo Messenger. [*Id.*]. When the chats were completed, Buchanan would copy and paste the information from the archive into a text file, and

then copy and paste it from the text file into an FBI-302 report; he would then author a 302 for that chat session and save it to a CD. [*Id.* at 61]. Buchanan testified he prepared a 302 for every chat or day of chat that he had with Montgomery; there was never a day when a chat occurred for which no 302 was prepared. [*Id.*].

During one of their early chats, Montgomery asked fastpitchdebbie13 if she was deleting her Yahoo chat archives, and instructed her on how to do so. [*Id.* at 62-63]. Ten days later, Montgomery gave fastpitchdebbie13 very specific step-by-step instructions on how to turn off the archiving feature in Yahoo so chat logs would not be kept. [*Id.* at 63-64]. Montgomery expressed concern about the content of their conversations being discovered by "fastpitchdebbie13"'s parents. [*Id.* at 64]. Buchanan testified the chats would not have been stored on Montgomery's hard drive if he turned off the archiving feature on his computer, and Buchanan believed, based on Montgomery's detailed instructions to "fastpitchdebbie13" about how to turn off the archive feature on her computer, that Montgomery had turned off the feature on his computer as well. [*Id.* at 62, 65].

Buchanan testified there were numerous dates during his interaction with Montgomery when he did not engage in chats with Montgomery. [*Id.* at 65]. This happened for various reasons, including Buchanan's absences from the office for holidays, vacation or training and Montgomery's unavailability. [*Id.* at 66]. If Buchanan knew he was going to be away for a long time, he would often provide cover stories in advance. [*Id.*]. If he was unable to do this, he would explain the absence after it occurred. [*Id.*]. There were days when Montgomery did not chat with him, and Buchanan did not know why a chat did not occur. [*Id.* at 66, 76]. However, he was certain that if there was no 302 report prepared for a day, no chat occurred that day. [*Id.* at 76-77]. In those chats, Montgomery never gave any indication he believed he was role-

playing with another adult or acknowledged it was a fantasy and he believed himself to be talking to an adult posing as a child. [*Id.* at 78].

### 2. Richard Dale Montgomery

Montgomery testified the initial contact with fastpitchdebbie13 occurred when he was in a Yahoo chatroom containing numerous other people and fastpitchdebbie13 was talking in the room. [*Id.* at 15, 16]. He claims he never asked her for her ASL [*Id.* at 15-16]. He claims fastpitchdebbie13 asked him if she could add him as a friend, he responded affirmatively, she "selected the box which brings up a buddy list window box asking me to add [her], so then I added [her]." [*Id.* at 16].

In the evidentiary hearing, Montgomery testified on direct examination that chats were missing from February 15-16, 2007, April 23-27, 2007 and June 15, 2007. [Dkt. #131, May 23, 2011 Hrg. Tr. at 20, 24, 30-31]. On cross examination, however, he agreed he was asserting the government withheld in excess of 30 days of chats between him and fastpitchdebbie13. [*Id.* at 43-44]. He testified he had told Ward there were 30 to 40 missing chats. [*Id.* at 44]. He testified he told Ward that the chat from the initial contact on January 23, 2007, would have shown there was no age, sex or location conversation on that date. [*Id.*]. He testified he told Ward the 30 or 40 days of missing chats would have been exculpatory for his defense, showing fastpitchdebbie13 initiated most of the chats. [*Id.* 45].

Montgomery claimed that when his chats with fastpitchdebbie13 began in January 2007, the archive feature of his computer had been set to capture their chats, but six weeks into the chats, he turned off the archiving feature so that their chats would not be captured. [*Id.* at 22]. He admitted he did not want the chats to be recorded because of the sexually explicit nature of the chats. [*Id.* at 46-47]. He further admitted there were sexually explicit chats in the first six

weeks of his conversations with fastpitchdebbie13. [*Id.* at 47]. He testified he suggested she turn off the archive feature because her mom would have access to her computer, and he turned off the archive feature on his computer out of concern that his wife could access his chat records. [*Id.* at 51].

Montgomery asserts that the 30-50 missing chats contained exculpatory information because they showed the government initiated certain conversations. [Dkt. #131, May 23, 2011 Tr. at 45]. However, he admitted none of the alleged missing chats would have contained any explicit statement that the conversations were taking place between adults. [*Id.* at 46]. Further, during his chats with fastpitchdebbie13, Montgomery engaged in conversations of a sexually explicit nature. [*Id.* at 47]. The chat transcripts entered into trial evidence were accurate depictions of the chats that took place on the dates and times identified on the transcripts. [Dkt. #136 at 4, Dkt. #131 at 19]. Montgomery sent fastpitchdebbie13 two photographs, including one of his penis. [Dkt. #131 at 21, 181].

### 3. Defense Counsel Keith Ward

Defense Counsel Keith Ward entered an appearance in the case shortly after the indictment. [#126, Trial Tr. I at 40-41]. In assessing the discovery in the case, he developed a defensive theme that Montgomery had no previous disposition to have a sexual interest in juveniles, nor any past behavior consistent with such an interest; that the government agent consistently initiated chats, to which Montgomery responded, and that Montgomery, over a period of months, showed no real interest in actually having a sexual contact with a juvenile. [*Id.* at 43]. Ward read the entirety of the chat transcript discovery, 302s and remaining discovery multiple times at least five times. [*Id.* at 44]. He visited Montgomery, who was detained in jail, " a lot," and spoke with him "extensively"—"significantly more than most clients who are

obtained." [*Id.* at 46]. Ward furnished copies of the chat transcripts to Montgomery. [*Id.* at 46]. Montgomery expressed to Ward his belief that "[a] couple, two or three, chats that were conducted were not reflected in the government's discovery." [*Id.*]. Ward believed Montgomery thought the missing chats were supportive of his position in the case. [*Id.* at 48-49]. Ward attempted to obtain the hard drive that had been seized from Montgomery's home." [*Id.*]. Ward testified he would have hired a forensic specialist to analyze the hard drive for missing chats. [*Id.* at 50]. Ward had contacted people with forensic experience in analyzing hard drives, gotten a price and gotten to the point of their availability to do the work "had we had the hard drive." [*Id.* at 51]. The hard drive was not produced prior to trial. [*Id.*]. Ward testified he was interested in the hard drive "because from very early on in my representation of Mr. Montgomery he told me that he had never had a sexual contact with a child, that he didn't have any child pornography on his computer, that his computer would reflect the absence of an interest in children." [*Id.* at 54-55]. Ward stated, "Mr. Montgomery was consistent in his position that the FBI had sought him out, that he hadn't sought the faspitchdebbie13 out, that the FBI had sought him out, and was constantly messaging him trying to provoke him into these chats." [*Id.* at 55].

At the pretrial hearing on the case on September 6, 2007, Ward argued he needed the hard drive because "[i]f there was a total absence of information on his computer in which he had shown previous interest in children, then I think that would be exculpatory." [Dkt. #111 at 22-23]. Assistant United States Attorney Snow stated the government "would stipulate that no evidence was recovered from [defendant's] home that showed that he had an interest in children." [*Id.* at 23]. The proposed stipulation was not admitted at trial because the government

agent swore during his trial testimony that there was no evidence of child pornography collected from Montgomery. [Dkt. #126, TR of 5/5/11 hearing at 65-66].

At no time during the course of the trial did the government deliver Montgomery's hard drive to Ward. [*Id.* at 60]. Ward testified that prior to the start of trial he would have been interested in obtaining the hard drive, but after the start of trial, he was not sure he would have been able to have an examination of it conducted in the brief span of the actual trial. [*Id.* at 67]. He said the government's willingness to stipulate that no child pornography was found in defendant's home alleviated his concern that he had not had an opportunity to have a forensic examination of the hard drive performed. [*Id.*at 67-68]. Ward testified that Ward had been detained for a significant period of time and "it was hard on him mentally, it was hard on his family, and I wouldn't have announced ready for trial had Mr. Montgomery not agreed to proceed forward to trial at that time." [*Id.* at 68]. Asked whether Montgomery was "not a happy camper about going to trial without the hard drive," Ward responded, "I wouldn't categorize it as happy or unhappy camper. He was interested in, you know, some type of forensic examination of the hard drive. But again, if he'd been an unhappy camper in the sense that he did not want to go to trial without that having been done first, I wouldn't have announced ready for trial." [*Id.* at 69].

Ward testified that he had frequent communications with Snow, and thought Snow was very forthcoming and there was no effort to avoid contact with Ward. [*Id.* at 71]. Ward had no reason to believe Snow had not fully complied with his discovery obligations. [*Id.* at 117]. Ward believed the government had provided him with all transcripts of the chat exchanges between Montgomery and Buchanan. [*Id.* at 118]. Additionally, Ward issued a subpoena to Yahoo! to obtain copies of Montgomery's chats and, although Yahoo! responded to his

subpoena, it did not produce anything of substance. [*Id.* at 118-119]. Snow corroborated Ward's testimony, stating that at the time of trial, he had produced to the defense all discovery, including all chat logs. [*Id.* at 161]. Ward testified that Montgomery was very interested in obtaining the initial instant messaging between his client and the officer. [*Id.* at 58]. However, the communication exchange prior to Montgomery and fastpitchdebbie13 becoming "friends" was not captured. [*Id.* at 59]. Snow testified that he specifically requested that his agents attempt to retrieve the first chat exchange, but their efforts were not fruitful. [Tr. Vol. II, May 23, 2011 hearing, at 163-164].

Ward testified that during discovery, Montgomery told him there were a "small number"—perhaps one to three chats—conducted early in the exchange that were not reflected in the government's discovery production. [Dkt. #126, May 5, 2011 Hrg. Tr., 47-48; 121, 123]. Montgomery never mentioned there were 40 to 50 chats missing. [*Id.,* 121].

During the trial, Ward cross-examined Buchanan, establishing he never found an image of child pornography in Montgomery's possession. [Dkt. #97, Trial Tr. at 236]. Ward also questioned Buchanan about his initiation of various communications with Montgomery during the course of the investigation. Buchanan admitted on cross-examination that he initiated chats on January 24 and 25, 2007, that he made the first reference to body parts and the first specific reference to penises. [*Id.* at 259-260, 264]. He acknowledged that Montgomery did not initiate any chats with fastpitchdebbie13 between January 23 and March 15, or between March and June. [*Id.* at 268]. He also acknowledged that he rather than Montgomery initiated all but two of the IM chats. [*Id.* at 270, 352]. Buchanan admitted he wanted to move Montgomery out of pretend mode and into a face-to-face meeting. [*Id.* at 304, 312-319, 333-334].

The court instructed the jury concerning Montgomery's entrapment defense. [Dkt. #59, Jury Instructions, at 28].

### 4. Buddy Carter

Buddy Carter, a computer forensic examiner with the FBI, began a Computer Analysis response Team ("CART") exam on Montgomery's hard drive on September 7, 2007, when the agent notified him the case was going to trial. [Dkt. #131, May 23 Hr. Tr. at 105-106]. Carter was asked to search for text strings and chat logs. [*Id.* at 106]. The text streams he was told to look for were "fastpitchdebbie13" and "debbiehair" (the two names Buchanan used in his undercover capacity), as well as "montyhd1200" and "DR" (names used by Montgomery). [*Id.* at 28, 112, 120]. Carter was also asked to examine the hard drive for known files of child pornography. [*Id.*].

According to Carter, a chat log is a text file containing a record of communications between individuals. Depending on the software used to chat, the chat logs are stored in different places on the hard drive. [*Id.* at 106]. Yahoo chat logs are stored in the "user.dat" file. [*Id.* at 106-107]. Carter, in his forensic exam, did not find the sought text streams within chat logs or user.dat files. [*Id.* at 108-109]. He looked in the user.dat file for Yahoo chat logs, and there were no chat logs in those files. [*Id.* at 131]. Carter testified if a user was erasing his Yahoo chat archives, he would not expect find Yahoo chat logs in the user.dat files. [*Id.* at 131. If a user did not use the Yahoo chat's archive feature, the user.dat file would probably be empty. [*Id.* at 125]. If chats were archived before the archive feature was tuned off, the previously archived chats would be in the user.dat file, but a user can clear the archive out. [*Id.* at 131].

Carter was able to find text streams in fragments of chat in the computer's "pagefile.sys" file, which is part of the hard drive that provides random access memory. [*Id.* at 109, 132]. The

pagefile.sys file logs a variety of information, including some computer code and some text; it is not really user readable. [*Id.* at 110]. Chat information might be captured in the pagefile.sys as well as the user.dat file. [*Id.* at 111]. The pagefile.sys file would not be deleted if someone were deleting their Yahoo chat archives. [*Id.*]. When the amount of activity reaches the limit of the pagefile.sys file, it automatically starts back at the beginning and starts writing over the existing data, making it "a little unreadable." [*Id.*]. The text streams Carter was searching appeared in the pagefile.sys file, in chunks of what looked like "user names with chat stuff." [*Id.* at 111-112]. The chat data was not in order; it had been overwritten with computer code and "there were snippets of it in different locations. [*Id.* at 112]. It did not resemble a chat archive file like the user.dat file. [*Id.*]. Carter did not find any matches to known child pornography on the hard drive. [*Id.* at 117].

On September 11, 2007, after Carter completed the initial processing, he notified Special Agent Joseph Cecchini that the processing was ready to be reviewed. [*Id.* at 114]. He alerted Cecchini that there were hits for fastpitchdebbie and debbiehair in the pagefile.sys, but that it wasn't a full chat log. [*Id.*]. Carter told Cecchini there was no child pornography with known victims on the hard drive. [*Id.* at 117]. On September 21, 2007, Cecchini told Carter he did not need any results from the hard drive because the trial was completed. [*Id.* at 115].

### 5. Joseph Cecchini

Cecchini was the case agent on the Montgomery case. [*Id.* at 136]. He testified he took over Buchanan's undercover persona on a few occasions. [*Id.*]. Every time he engaged in a chat with Montgomery, he prepared a 302 report documenting the chat. [*Id.*]. Each chat was also recorted with the Yahoo archiver. [*Id.*]. Cecchini was not sure when Carter called him to tell him the case was ready for his review, but he recalled a conversation about the failure to locate

child pornography on Montgomery's computer.  [*Id.* at 142].  He did not have an independent recollection of reviewing the chat logs, but he did not consider any chat log fragments found by Carter to be of value, because he knew all the chats had been turned over, so he would not have believed any fragments were from chats different than those already turned over.  [*Id.*]  Cecchini testified that if he had seen any chat fragments that were exculpatory, he would have prepared a 302 and would have had Carter create a copy to provide to Assistant U.S. Attorney Edward Snow to provide to Ward.  [*Id.* at 152].

Montgomery agreed to meet fastpitchdebbie13 at the Bass Pro Shop in Broken Arrow. [*Id.* at 137].  Montgomery traveled to the designated meeting place, where he was arrested.  [*Id.*].

### 6. Edward Snow

Snow testified that he believed he had provided Ward with transcripts of all the chats that took place between the undercover agents and Montgomery.  [*Id.* at 161].  He believed that, at the time of trial, Carter had done a cursory forensic examination of Montgomery's computer, but that nobody had looked at everything on the computer.  [*Id.* at 167].  He knew Carter had not found any child pornography or any chat logs on the computer.  [*Id.*].  Snow recalled telling Ward that the computer had no child pornography on it, and Ward responded, "that's what we expected."  [*Id.* at 178].  After that, Ward did not ask Snow for the hard drive; it did not appear to Snow that it was something he wanted.  [*Id.* at 179-180].

### 7. Beverly Montgomery

The FBI returned the hard drive to Montgomery's wife, Beverly Montgomery, on August 6, 2008.  [Tr. Vol. I, May 5, 2011 at 147].  Mrs. Montgomery threw the hard drive in the back of her truck.  [*Id.*].  She stored it in her apartment, and then later moved to Moore, where she stored it in a closet.  [*Id.* at 147, 152-153].  In January 2011, she asked her daughter's boyfriend, who is

"an IT guy," if he would take the hard drive and try to pull family pictures off of it for her. [*Id.* at 147-148]. The boyfriend, Andrew Burnett, took the hard drive from Moore to Nashville, Tennessee. [*Id.* at 154]. Burnett took the hard drive to a friend who tried to retrieve the photos by using a "special machine." [*Id.* at 155]. When the boyfriend tried to do so, he said the drive was clean and "there was nothing there." [*Id.* at 148]. Mrs. Montgomery asked for the return of the hard drive, at Mr. Montgomery's request, in preparation for the evidentiary hearing. [*Id.* at 148].

### 8. Attempted Forensic Examination of Hard Drive

At the beginning of the hearing on May 5, 2011, counsel for Montgomery, Barry Derryberry, advised Magistrate Judge Wilson he had obtained Montgomery's hard drive and was endeavoring to analyze it, but had run "into problems getting into it at all." [Tr. Vol I at 3]. Magistrate Judge Wilson granted him additional time to complete his examination. At the beginning of the hearing on May 23, 2011, Derryberry stated:

> I've been on about a six-week ordeal with a computer issue and it's completed and the real upshot of it is I won't have any additional witnesses that bear on that issue. And in addition, the Government and ourselves have a stipulation which is that the computer is broken for lack—the hard drive is broken for lack of a more technical reason to account for the issue and cannot be accessed.

[Tr. Vol II at 3]. Derryberry added that because it "did not give us a window into what's on the computer so that we could discover what the computer may have had that was not provided in discovery. … it doesn't have a window into exactly what Mr. Ward might have been able to acquire had he acquired the hard drive." [*Id.* at 3].

**B. Analysis**

The court concludes Ward's efforts to obtain the hard drive met or exceeded an objective standard of reasonableness. In so concluding, the court has weighed the credibility of Ward's testimony that Montgomery only told him of one to three missing chats against Montgomery's claim that he told Ward there were 30 to 50 missing chats. The only evidence supporting Montgomery's claim is his own testimony, and that testimony is itself inconsistent. Further, Buchanan testified that other than the initial chat between Montgomery and fastpitchdebbie13 on January 23, 2007, all chats had been recorded and 302 reports had been prepared. Additionally, Montgomery turned off the archive function on his computer six weeks into the chat relationship with fastpitchdebbie13 and gave her detailed instructions about how to do the same thing on her computer. The government's forensic specialist Carter did not find the sought text streams within chat logs or user.dat files. He looked in the user.dat file for Yahoo chat logs, and there were no chat logs in those files. Carter testified if a user was erasing his Yahoo chat archives, he would not expect find Yahoo chat logs in the user.dat files. If a user did not use the Yahoo chat's archive feature, the user.dat file would probably be empty. If chats were archived before the archive feature was turned off, the previously archived chats would be in the user.dat file, but a user can clear the archive out.

Thus, the court finds Ward's testimony about the number of missing chats reported to him by Montgomery is more credible than Montgomery's claim that he told Ward 30 to 50 chats were missing.

Additionally, the evidence established that the initial chat exchange was not stored in the archives of Montgomery's computer at the time it was seized by government agents. Montgomery testified that he archived his chat exchanges for six weeks before he closed the

Yahoo! archive feature on the computer, but he admitted that on January 23, 2007, the date of his initial contact with Buchanan, there were 40 or 50 people active in the chat room and he was chatting with more than one of them on instant messenger. [Tr. Vol II at 15]. Buchanan testified that, at best, it was speculative whether the initial chat was captured on Montgomery's hard drive at all and that if it had been saved, it would have overwritten itself with other chats which occurred in the following six months. Specifically, he testified:

> Even if it were stored that way, that information is constantly overwriting itself because you only have a certain capacity for storage in your hard drive. Your hard drive is only a certain amount—can only hold a certain amount of data. You're talking about six months of online shopping, doing whatever he was doing. Even if it did store there, it would have been overwritten unless it was specifically saved.

[Tr. Vol. II at 88-89].

The FBI's forensic examiner, Carter, testified he was unable to find any chats on Montgomery's hard drive and although he found text streams in fragments of chat in the computer's "pagefile.sys" file, the chats had been overwritten, were out of order and were only fragments. Cecchini, the agent in charge of the investigation, did not consider the fragments to be useful because he and Buchanan had completed 302s on all chats that had taken place.

The court further finds that Ward's efforts to obtain the hard drive and his decision to proceed to trial without the drive was reasonable under the circumstances. A primary theory of the defense was that Ward showed no predisposition to having sexual contact with minor females, that he didn't have any child pornography on his computer and that his computer would reflect the absence of an interest in children. Carter's partial forensic examination of the hard drive confirmed there was no child pornography on the computer, and once the government indicated a willingness to stipulate to this fact, Ward decided he could proceed to trial without the hard drive. Based on the government's concession and because he believed the ongoing

mental strain on Montgomery and his family was detrimental, he concluded the best course was to proceed to trial. During trial, Ward obtained admissions at trial that supported the entrapment defense, including that (1) Buchanan initiated chats on January 24 and 25, 2007; (2) Buchanan made the first reference to body parts and the first specific reference to penises; (3) Montgomery did not initiate any chats between January 23 and March 15, or between March and June; (4) Buchanan rather than Montgomery initiated all but two of the IM chats; and (5) he wanted to move Montgomery out of pretend mode and into a face-to-face meeting.

Additionally, the court finds even if Ward's conduct did not meet required professional standards, Montgomery was not prejudiced because (1) Ward elicited exonerating evidence in his cross examination of Buchanan and other government witnesses and (2) it is undisputed that Montgomery engaged in conversations of a sexually explicit nature with fastpitchdebbie13, sent her two photographs, including one of his penis, agreed to meet fastpitchdebbie13 at the Bass Pro Shop in Broken Arrow, and traveled to the designated meeting place, where he was arrested.

The court rejects Montgomery's argument that Ward provided ineffective assistance of counsel with respect to his efforts to obtain Montgomery's hard drive.

### IV. Failure to Call Character Witnesses at Sentencing

Montgomery contends Ward rendered ineffective assistance by failing to comply with his request to call four character witnesses as mitigating evidence at the sentencing hearing. He identified the four potential witnesses as Lindsey Flowers Liles, Leslie James Bishop, Ray Sikes and John Gulick.[1]

---

[1] Montgomery did not testify Ward refused to call these witnesses, but rather that, on the day of sentencing, the witnesses were unable to drive from Oklahoma City to Tulsa because there was an ice storm. [Tr. Vol. I at 165-166]. Thus, his testimony establishes that the four potential character witnesses were unavailable to testify at sentencing due to extreme weather conditions.

Liles testified at the evidentiary hearing that she was a neighbor and friend of Montgomery's daughter, Tiffany, who is her age. [*Id.* at 25]. She had been a friend of Tiffany's since they were five or six years old, and testified they were and are best friends. [*Id.* at 25-26]. She was at the Montgomery house "a lot" and stayed the night approximately 25 to 30 times. [*Id.* at 26]. She testified Montgomery never said or did anything or looked at her in any way that made her feel uncomfortable, and she never developed any suspicion that he an any inappropriate interest in underage females. [*Id.* at 26-27]. She testified she does not know how she would have felt at the time if she knew Montgomery was engaged in sexual internet chats with a minor. [*Id.* at 28-29].

Bishop testified at the hearing that he is Montgomery's second cousin, that he has known Montgomery for 23 years, and that they worked together at Tinker Air Force Base. [*Id.* at 30-31]. He had played golf, hunted, and fished with Montgomery, and had helped him do remodeling on his house. [*Id.* at 31]. He saw Montgomery in the presence of his family or daughters five times. [*Id.* at 32]. He never saw anything that made him suspicious Montgomery had any interest that was inappropriate in children. [*Id.*]. If Montgomery had told him he was interested in sex with underage girls, Bishop stated, "I would have probably disowned him because I don't go for that kind of thing." [*Id.* at 32-33].

Sikes is a pastor at First Baptist Church of Choctaw. [*Id.* at 33]. He has known Montgomery as a member of the church and friend for 15 years. [*Id.* at 34]. Sikes testified he had seen Montgomery in the presence of his wife and daughters at church and in his home and had never witnessed anything that caused him to have suspicions that he had inappropriate interests in young females. [*Id.* at 35]. Montgomery never shared with Sikes that he was engaging in internet chats seeking sex with underage girls. [*Id.* at 36].

Gulick has known Montgomery since 1995. [*Id.* at 36]. He was a next-door neighbor. [*Id.* at 37]. Montgomery and his family spent a weekend with Gulick and his wife at the Gulick's cabin at Lake Eufala in 1995. [*Id.* at 38]. Montgomery never said or acted inappropriately regarding young females or his daughters. [*Id.*]. He testified that if Montgomery had told him he was interested in sexual relations with underage females, he "wouldn't have let it pass." [*Id.* at 39].

Montgomery testified that he knew at his sentencing he was facing a mandatory minimum statutory sentence of 10 years, and Ward could not have done anything to obtain a sentence below that minimum. [*Id.* at 156-157]. However, he was hoping the supervised release would be lower. [*Id.* at 157]. Montgomery was facing a supervised release term ranging from five years to life. He was sentenced to seven years supervised release. Montgomery asserts the testimony described above would have reduced his term of supervised release and eliminated some of the Special Sex Offender Conditions imposed in General Order 99l-17, adopted by the court on July 13, 1999. [Ex. 35 to Evidentiary Hearing]. Montgomery asserts Ward did not advise him of the Special Sex Offender Conditions until after he was sentenced. Montgomery contends the four witnesses would have established his credibility and negated any inference of a possible future threat to young girls.

Ward testified that before sentencing he discussed with Montgomery mitigation and aggravation. [*Id.* at 80]. He testified that in deciding whether to call witnesses at sentencing, he has discussions with clients, they provide him with input, he provides input and "then we arrive at a decision which is the client's decision but I go with the client's decision." [*Id.* at 126]. Ward stated, "If he had instructed me to call a witness, I would have called a witness. If we agreed not to call a witness, I wouldn't have called a witness." [*Id.*]. He testified Montgomery

did not, at the close of their discussions about sentencing, instruct him to call any witnesses.

[*Id.*].  Ward acknowledged the decision whether to call witnesses at trial or sentencing is a

strategic decision.  [*Id.*].  Ward testified that witnesses at trial had testified Montgomery had

never acted inappropriately toward preteen girls, and he believed the trial judge probably viewed

Montgomery's behavior as aberrant conduct and did not view him as a child molester.  [*Id.* at

127].  Ward stated:

> I did not believe that Judge Frizzell looked disfavorably on Mr. Montgomery as a
> person, only as to that instance of conduct, because I thought Judge Frizzell probably
> had a pretty clear picture that this was an aberrant conduct even for Mr. Montgomery,
> that he wasn't a child molester, that he didn't collect child pornography.  I think
> Judge Frizzell formed that opinion during the course of the trial.

[*Id.*].

Asked whether calling additional witnesses at sentencing could have made a difference

in the terms of supervised release, Ward said it was "all speculation,"  and "[t]he judge may have

conceivably broke with protocol of the general order….[c]ould have, but I don't think it would

have changed."  [*Id.* at 127-128].  Ward testified that if a client would have asked him about

whether additional witnesses would result in a modification of the Special Sex Offender

Conditions imposed during supervised release, he would have advised the client that "those

general conditions are going to be imposed as a matter of course because that's pretty much the

purpose of general orders."  [*Id.* at 128].  Ward testified that before sentencing Montgomery was

not aware of the 12 specific conditions in the general court order, but "[h]e was aware there

would be conditions of supervised release."  [*Id.* at 98].

Ward called two witnesses to testify at Montgomery's trial:  Christine Ward, a long-time

friend of his daughter, and Beverly Montgomery, his wife.

Ms. Ward, then 24, testified she was the same age as the Montgomerys' daughter, Tiffany. [Dkt. #98 at 462-463]. She had begun living next to the Montgomerys when she was 12 years old and still lived at the same address at the time she graduated from high school in Choctaw, and for two years during college. [*Id.* at 463]. Tiffany was her best friend. [*Id.*]. Every day or every other day she was at Tiffany's house or Tiffany was at hers. [*Id.* at 464]. She testified that Montgomery was at the home at the same time "a vast majority" of the time. [*Id.*]. There were slumber parties at the Montgomery home during which 9 to 10 girls would stay the night. [*Id.* at 464-465]. Montgomery never gave her any reason to feel uncomfortable. [*Id.* at 465]. He never exhibited any type of sexual interest in her, and never acted or behaved inappropriately toward her or other girls. [*Id.*]. She viewed him as a second father, and other girls that spent time there did as well. [*Id.* at 465-466]. Based on her experience, she believed it was "very, very unlikely" that he had a predisposition to sex with minors. [*Id.* at 466].

Beverly Montgomery testified that during her 27-year marriage to defendant, she never had any reason to suspect her husband might have an interest in having six with minors. [Dkt. #99 at 499-500]. Young girls were in and out of their house "all the time," and she never saw any inappropriate conduct between him and any minor." [*Id.* at 500]. While defendant was in the Tulsa County Jail before trial, Mrs. Montgomery had telephone conversations with him in which she asked him about another girl that he had been talking to online. [*Id.* at 509]. Montgomery told her that when he came to Tulsa July 15, 2007, he intended to have sex with another individual, but that it was with an adult woman. [*Id.* at 510]. He admitted he had some telephone numbers in his pocket when he was arrested. [*Id.* at 511]. He admitted he talked to several women online. [*Id.* at 512]. Mrs. Montgomery testified she had no idea he was talking online with other girls and women. [*Id.* at 512]. During the time frame he was doing that, she

was not with him.  [*Id.*].  She testified that during one conversation she asked him whether he wore a condom when he had sex with other women.  [*Id.*].  He told her he did not wear a condom with those women because it was only oral sex.  [*Id.* at 512-513].  She admitted there was a whole different side of her husband's life that she did not know about.  [*Id.* at 513].

AUSA Snow testified that had Ward called one or more of the proposed sentencing witnesses, he would have called the other child victim to testify that Montgomery had also had conversations of a sexual nature online with her.  [Tr. Vol. II at 170-171].  Snow had filed a response under Fed.R.Evid., 404(b) of his intent to call the minor child.  [Dkt. ##24, 29].  In his 404(b) response brief, Snow proffered that Montgomery had telephoned the home of the minor, who was 15 years old, spoken to the victim's father and represented himself to be a 17-year-old boy.  [*Id.*].  Snow testified that he wanted Montgomery to be on supervised release for life because here had been two victims.  [*Id.* at 170].

The court finds credible Ward's testimony that Montgomery did not ask him to call witnesses at the sentencing hearing.  Additionally, during trial, the court heard evidence regarding Montgomery from family and friends.  The proposed testimony of the four witnesses was cumulative in nature.  Further, by foregoing the opportunity to present cumulative character evidence Ward prevented the government from putting on the testimony from another minor girl about online chats with Montgomery.  Such evidence would clearly impeach the proposed witnesses' claim that he was no threat to minor girls.  As a result, defendant could have received an increased term of supervised release, since this was evidence that his contact with fastpitchdebbie13 was not an isolated act.

Montgomery has not overcome the presumption that, under the circumstances of the case, the decision not to call character witnesses at the sentencing might be considered sound trial

strategy. *Strickland,* 466 U.S. at 689. Further, he has failed to show any prejudice. Therefore, the court rejects Montgomery's claim of ineffective representation in the sentencing.

### V. Failure to File Appeal

Montgomery contends that he asked Ward to file a direct appeal from his conviction and sentence, and Ward failed to do so. Ward testified that between the time of the verdict and Montgomery's sentencing, he had multiple discussions with his client about whether to file an appeal. [Tr. Vol. 1 at 92-93, 95]. Ward testified, "There were probably times when he said, yeah, he wanted to appeal and times when he said he didn't want to appeal. But the final decision he never made until after imposition of the judgment and sentence." [*Id.* at 96].

Ward testified he explains the appellate process to his clients, and he discussed with Ward whether there were any errors of law that occurred at trial that would be sufficient to result in a reversal. [*Id.* at 100]. In Ward's opinion, there were not any issues that would be likely to result in a reversal or a new trial. [*Id.*]. Ward counseled Montgomery the goal of an appeal would be to obtain a reversal of a conviction and then a new trial. [*Id.* at 101]. However, he told him that it was his opinion there was nothing at trial that was likely to result in a reversal or new trial. [*Id.*]. Ward did not believe an appellate court would have reversed the court's decision to impose seven years of supervised release rather than five, because it was "a discretionary issue with the court," and not an appealable issue. [*Id.* at 102].

Ward also discussed with Montgomery reasons why he might elect not to appeal. [*Id.* at 103]. He said the ordeal had been "extremely traumatic to Mr. Montgomery and his entire family, his wife, his children." [*Id.*]. Ward testified:

Mr. Montgomery was upset, on behalf of his family, not just for himself, on behalf of his family. His family had to liquidate his retirement account to pay me. Ms. Montgomery was moving out of the family home to a smaller home. It was disruptive,

at a bare minimum in an emotional sense to his two daughter who were really lovely people. So I explained to Mr. Montgomery, I said, "Okay. Here's what the law says. You have a right to appeal. You may want to hire me, you may want to hire another lawyer. And if you can't afford to hire a lawyer, the court's going to appoint one for you. If you hire me, I'm going to require an additional fee and it's going to be additional hardship on your family. And if you hire another lawyer, it's going to be an additional financial hardship on your family. But if you can't afford, the court appoints one for you. Here you're faced with this situation where you've got a minimum mandatory sentence, so you're not going to get a sentence reduction. In my opinion, the chances are very slim that this conviction will be reversed on appeal because one of the considerations is, you know, as a lawyer you're not goading the court into making mistakes but you're hoping the court will make mistakes for appellate issues. But the court basically allowed us to conduct the trial as we wanted to conduct it. The court didn't make any rulings that I thought were sufficient to result in reversal." And so I laid it all out there to him and he elected not to appeal.

[*Id.* at 103-104]. Ward said that he told Montgomery there was "an extremely slight chance that if you were convicted—or reversed and sent back for new trial, that you could receive more of a sentence," but I regarded that as being a very slight possibility. I didn't think that was very realistic." [*Id.* at 104-105]. Ward testified he discussed with Montgomery that the state of the law would discourage a judge from imposing a greater sentence. [*Id.* at 105].

Ward stated that throughout the course of representation, he had approximately half a dozen discussions with Montgomery about the pros and cons of pursuing an appeal. [*Id.* at 128-129]. Ward testified that Montgomery made the decision not to appeal, and Ward acquiesced in his decision. [*Id.* at 129]. If Montgomery had asked him to appeal, he would have filed a notice of appeal and then allowed him "either find other counsel, hire me, or get court-appointed counsel, or do what the circuit court of appeals directed me to do." [*Id.*]. He has done this in other cases. [*Id.*]. Almost every person he represented who went to trial has elected to appeal. [*Id.* at 130]. However, Ward was not surprised Montgomery elected not to appeal, in light of their earlier discussion about the impact on his family. [*Id.*]. Ward testified he probably did not

tell Montgomery he had an ability to file a pro se notice of appeal because Ward would have filed the appeal for him and "wouldn't have expected him to do it himself." [*Id.* at 113].

Montgomery was sentenced on December 11, 2007. [*Id.* at 111]. The court entered a written Judgment on December 19, 2007. [Dkt. #66]. His appeal time expired on January 7, 2008. [*Id.*].

After Ward's last visit with Montgomery, some time remained for filing a notice of appeal. [*Id.* at 111]. During the remaining time for appeal, Ward remained accessible to Montgomery if he wanted to contact him regarding filing a notice of appeal. [*Id.*].

After the time for appeal had expired, Ward never received any phone calls from Montgomery asking why he had not filed an appeal on his behalf. [*Id.*].

Montgomery admitted that he had discussions with Ward regarding his right to file an appeal, but testified Ward wanted to defer the conversation until after he was sentenced. [*Id.* at 168]. He claims Ward did not discuss any appeal with him before the sentencing. [*Id.* at 170]. After the sentencing, Ward came to see him sometime after Christmas, "a couple of days after Christmas, I think." [*Id.*]. Montgomery testified he told Ward he wanted to appeal. [*Id.* at 170-171]. He contends Ward responded, "The same evidence, same testimony, same results," and did not describe to him any potential benefits of appealing. [*Id.* at 171]. He testified Ward only described negative sides to appealing. [*Id.*]. Montgomery claims Ward told him if he appealed, he would have to retain other counsel, and did not tell him he might have court-appointed counsel. [*Id.* at 172]. Montgomery understood from his discussion with Ward that he had the

option of hiring another attorney and having the attorney argue ineffective assistance of counsel. [*Id.*].[2]

Montgomery claims that after this meeting, he tried to call Ward for days, all the way up through January 7, 2008. [*Id.* at 173]. He contends nobody answered the phone at Ward's office, and during the Christmas holidays, "through eight or nine days in there we couldn't use the phone, the phones were broke, and there was no way to get any phone calls out." [*Id.* at 173-174]. Montgomery contends he sent his wife a letter to have Ward call her. [*Id.* at 171].

Mrs. Montgomery, however, did not substantiate this assertion. She testified that she never brought up the subject of an appeal with Ward. She testified she had a hard time with exact dates, but she recalled that Ward discussed a possible appeal with her after the trial, and that he tried to tell her his opinion that he did not think an appeal was a good idea, "which wasn't my decision at all." [*Id.* at 145]. She never testified that she tried to contact Ward after Christmas at the request of her husband. [*Id.*].

As Magistrate Judge Wilson noted in his Report and Recommendation, resolution of the appeal issue requires the court to weigh the credibility of Montgomery and Ward, since their testimony conflicts. Montgomery claimed that in his final conversation with Ward, he told him he wanted to appeal, yet he also testified he attempted unsuccessfully to contact him after Christmas to tell him he wanted to appeal. Further, he testified the jail phone were broken for eight or nine days at Christmas, yet asserted he attempted to telephone Ward's office but no one answered the phone. He claims he also sent his wife a letter instructing her to contact Ward about an appeal, but his wife's testimony failed to corroborate this claim. Finally, the fact that

---

[2] Montgomery never testified that Ward told him outright that he refused to file a notice of appeal for him.

Montgomery completely failed to contact Ward after the expiration of the filing period undermines his claim that he told Ward to file an appeal.

Ward has been a defense attorney for 25 years and was a prosecutor for 10 years before that. He has tried cases in federal court for more than 25 years, and is admitted to appear before the Tenth Circuit Court of Appeals. [*Id.* at 113-114]. He has handled approximately 40 to 50 appeals as either a prosecutor or defense attorney and is comfortable handling a case on appeal. [*Id.* at 114]. He testified that filing a notice of appeal is a simple process which takes very little time. [*Id.* at 137].

The court concludes that Ward's testimony is more credible than Montgomery's on the issue of appeal. For this reason, the court finds Montgomery did not instruct Ward to file a notice of appeal, and Ward was not ineffective in his advice and counsel to Ward regarding an appeal.

## VI. Conclusion

Having reviewed the record pertaining to Montgomery's motion de novo, the court concludes Montgomery has failed to meet his burden to show Ward's performance was deficient in his representation of him, or that the outcome would have been different had Ward done the things Ward now claims constitute error. Therefore, the Report and Recommendation of the Magistrate Judge [Dkt. #138] is affirmed, and plaintiff's Motion for Relief under 28 U.S.C. § 2255 [Dkt. #70] is denied.

ENTERED this 27th day of February, 2012.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma

27